IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In re: Ross H. Briggs,                               )
                                                     )
         Ross H. Briggs, Petitioner.                 )
                                                     )
         v.                                          )         Case No. _____
                                                     )
         Charles E. Rendlen III, United              )
         States Bankrupty Judge, and                 )
         Robert J. Blackwell, Chapter 7              )
         Bankruptcy Trustee, Respondents.            )

## PETITION FOR WRIT OF PROHIBITION

COMES NOW Petitioner Ross H. Briggs, counsel for Debtor Marshall Beard in

Chapter 7 bankruptcy proceeding, 14-43751, pursuant to 28 U.S.C. §1651(a), and

petitions this Court for a writ prohibiting Judge Charles E. Rendlen, III from issuing a

final order suspending Petitioner from practicing before the Bankruptcy Court for the

period of six months.  In support of his Petition for a Writ of Prohibition, Petitioner

states:

### The Issues Presented

1.       Petitioner is *pro bono* counsel for Debtor Marshall Beard.  Petitioner has

represented Mr. Beard after the suspension of Attorney James C. Robinson, Mr.

Marshall's prior attorney.

2.       On July 22, 2015, Judge Rendlen entered an Order advising Petitioner that

he intended to impose a sanction upon Petitioner in the form of a six (6) month

suspension from practicing before the Bankruptcy Court.[1]  In the July 22, 2015 Order, the Court further advised that if Petitioner was unwilling to agree to a voluntary six (6) month suspension, the Court would consider imposing additional sanctions, including a referral to the Missouri Supreme Court's Office of Chief Disciplinary Counsel.

3.      Petitioner filed a response to the July 22, 2015 order. In the response, Petitioner asserted his objection to the entry of any final order imposing sanctions in light of *Stern v. Marshall*, 564 U.S. __, 131 S. Ct. 2594 (2011) and *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. __, 134 S.Ct. 2165 (2014).

4.      On August 4, 2015, Judge Rendlen entered an Order holding that *Stern* had no application to this matter, and holding that he has the authority to sanction Petitioner under Title 11 (the Bankruptcy Code) and the "inherent power of the Court to enforce its own orders."  (Order, August 4, 2015, DOC. 112, p. 18).

5.      Judge Rendlen lacks authority under Article III of the United States Constitution to enter a final order imposing sanctions upon Petitioner. Rather, if Judge Rendlen believes that sanctions are warranted, he has only the jurisdiction to enter proposed findings of fact and conclusions of law, for *de novo* review by this Court. *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. __, 134 S.Ct. 2165 (2014).

6.      Judge Rendlen also lacks the authority to suspend Petitioner from practicing before the Bankruptcy Court under Rule 83 of the Local Rules of Court of this

---

[1] Judge Rendlen entered an identical order in eight (8) cases:  *In re Evette Nicole Reed*, Case No. 14-44818, *In re: Pauline A. Brady*, Case No. 14-44909, *In re Lawanda Lanae Long*, Case No. 14-45773, *In re: Marshall Beard*, Case No. 14-43751, *In re Darrell Moore*, Case No. 14-43444343, *In re Nina Lynne Logan*, Case No. 14-44329, *In re Jovon Neosha Steward*, Case No. 14-43912, and *Angelique Renee Shields*, Case No. 14-43914. Although these cases involve virtual identical issues, and the hearings on various matters have been consolidated, the Court has thus far, declined to consolidate the cases.  The issues raised in this Writ of Prohibition are applicable to all eight cases.

Court and the Local Rules of the United States Bankruptcy Court for the Eastern District
of Missouri.   Judge Rendlen's proposed *sua sponte* suspension of Petitioner fails to
afford Petitioner the due process rights inherent in this Court's disciplinary process,
particularly here where the Court has acted as accuser, fact-finder, and sentencing judge.
Judge Rendlen's proposed *sua sponte* suspension of Petitioner, in this proceeding,
violates Petitioner's right to due process of law and equal protection of the law under the
Fifth Amendment to the Constitution.

   7. Petitioner is entitled to a writ of prohibition because Judge Rendlen has
proposed to act outside of his jurisdiction by entering a final judgment suspending
Petitioner from practicing before the bankruptcy court.  *In re: State of Missour*i, 664 F.2d
178, 180 (8th Cir. 1981)(writ of prohibition lies to confine a lower court to the lawful
exercise of its jurisdiction).  The harm to Petitioner is immediate and he has no other
adequate remedy.  *Id*.

   8. The harm to Petitioner's clients is immediate, irreparable and compelling.
Petitioner is currently counsel of record in 727 cases filed under Chapter 13 and 209
cases filed under Chapter 7.  Petitioner also represents individuals who are in need of
bankruptcy protection whose cases have not yet been filed.  Ninety percent (90%) of
Petitioner's clients are African-American, two-thirds are female and many are single
parents.  As bankruptcy debtors, they have limited, or no means, to pay substitute
counsel.  Further, even for those who can obtain substitute counsel, adverse rulings may
occur in their bankruptcies during the interim.

   9. Petitioner requests an Order from this Court prohibiting Judge Rendlen
from entering any final judgment suspending Petitioner from practice before the

Bankruptcy Court or imposing any similar sanction upon Petitioner, and directing him that if he believes such sanction is warranted, his action should be in the form of a recommendation to this Court.

10.     Copies of the Orders of Judge Rendlen, as well as other relevant portions of the record below are included in the Appendix.

Facts Pertinent to the Petition for a Writ of Prohibition

**1.**   Petitioner is a solo practitioner with a consumer bankruptcy law practice located at 4144 Lindell Boulevard, Ste, 202, St. Louis, Missouri 63108.

**2.**   As of August 5, 2015, Petitioner is counsel of record in the United States Bankruptcy Court for the Eastern District of Missouri in 727 cases filed under Chapter 13 and 209 cases filed under Chapter 7. Included in Petitioner's caseload are many active cases that Petitioner took over, as *pro bono* counsel, in the wake of the suspension of James C. Robinson. (See Exhibit A).

**3.**   On June 10, 2014, Judge Rendlen issued an order suspending Attorney James Robinson, Debtor's prior counsel, from practicing before the Bankruptcy Court.  *In re LaToya Steward*, 11-46399 (hereinafter "Steward Order").

**4.**   The Steward Order suspending Robinson was effective immediately and made no provision for Robinson's clients.[2]

---

[2] Rule 5 of the Rules Governing the Missouri Bar and the Judiciary provides a procedure to be utilized in Missouri state courts when an attorney is not able to comply with his duties to clients because of death, disability or suspension. Rule 5.26 provides for the appointment of a trustee to "protect the interests of the clients," including conducting an inventory of client files, review of active case files and assistance in helping the client obtain other counsel.  ABA Model Disciplinary Rule 28 contains a similar provision. The Order suspending Mr. Robinson, who was counsel of record in approximately 400 cases, representing primarily low-income minority debtors, contained no such provision.

**5.**   Robinson contacted Petitioner and requested Petitioner's assistance in representing his clients.

**6.**   Petitioner believed that Robinson's suspension presented a risk that many of Robinson's clients were in danger of losing their homes in foreclosures, their automobiles through repossession, or their funds through creditor garnishments as a result of their lack of legal representation. Petitioner believed that it was his duty as an attorney to assist Robinson's clients to the extent possible.

**7.**   Petitioner sought the guidance of Paul Randolph, Assistant United States Bankruptcy Trustee, disclosing the substance of his agreement to represent Robinson's Chapter 7 clients on a *pro bono* basis.

**8.**   Randolph encouraged Petitioner to offer his *pro bono* services to Robinson's former clients and advised Petitioner to seek the guidance of the Court regarding the conditions of such representation.

**9.**   Petitioner entered his appearance on behalf of 227 Chapter 7 debtors, who had formerly been represented by Robinson.  (See, Exhibit A).

**10.**   Petitioner filed a bankruptcy proceeding for Dorothy Galbreath.   Robinson had previously represented Ms. Galbreath, who had signed the documents required for her bankruptcy filing, but Robinson was unable to file a bankruptcy petition due to his intervening suspension. Accordingly, on June 11, 2014, without the protection of the automatic stay protection afforded by the United States Bankruptcy Code, Ms. Galbreath's car was repossessed. Petitioner filed a bankruptcy petition to retrieve her vehicle.

**11.**   On June 16, 2014, in that bankruptcy, Petitioner filed a Motion for a Protective Order, seeking the Court's guidance in representing Galbreath as *pro bono* counsel.  On July 10, 2014, Judge Surratt-States heard Petitioner's motion and issued an Order terminating Robinson as counsel for Ms. Galbreath and adding Petitioner as counsel for Ms. Galbreath.  (*In re Dorothy Galbreath*, 14-44814, DOC 16, 7/10/14).

**12.**   Around the time of the filing of the bankruptcy petition for Ms. Galbreath, Petitioner began to enter his appearance on pending bankruptcies for other clients of Robinson.

**13.**   Judge Kathy Surratt-States and Judge Barry Schermer, the other two bankruptcy judges in this district, entered show cause orders in thirty-two (32) of these cases directing Petitioner to demonstrate that his representation of Robinson's clients was not a violation of the Steward Order and that it did not run afoul of the fee-sharing provisions of the Missouri Rules of Professional Responsibility.

**14.** Petitioner appeared before Judge Kathy Surratt-States and Judge Schermer on these show cause orders, explained the basis for his representation and confirmed that his Chapter 7 representation would be afforded free-of-charge.  In each instance, Judges Surratt-States and Schermer withdrew their show cause orders without the imposition of any discipline or sanctions upon Petitioner.  In addition, at the conclusion of these show cause hearings, both Judge Surratt-States and Schermer allowed Petitioner to represent the debtors, after terminating Robinson as the Debtor's counsel. (Petitioner had identified his relationship with Robinson as "co-counsel," because, despite Robinson's suspension, Judge Rendlen had not terminated Robinson as attorney of record for debtors in any of

these cases, and Robinson remained an attorney licensed to practice law in the State of Missouri.)

**15.** Of these cases subject to the show cause orders, thirty-one (31) were filed under Chapter 7.  In each of these cases, the debtor subsequently received a discharge of his or her debt.  The remaining case, *In re Julie Monsita Chavis*, Case No. 14-44979, was filed under Chapter 13.  Ms. Chavis' Chapter 13 Plan was approved and she is currently making payments to the Chapter 13 Trustee in accordance with that plan.

**16.**   Petitioner also entered his appearance on behalf of Robinson's Chapter 13 clients. Judges Schermer and Surratt-States entered various orders which provided for the payment of attorneys fees to Petitioner and Robinson for the legal representation of these clients.

**17.**   Petitioner's proposed suspension originates in a proceeding in which Judge Rendlen sought the return of "unearned fees" of Robinson to the bankruptcy estate under 11 U.S.C. §329 in eight Chapter 7 bankruptcies..  More particularly, on November 26, 2014 and December 2, 2014, Judge Rendlen issued Show Cause Orders, which directed Robinson to show cause why the Court should not order disgorgement of attorneys fees ranging from $299 to $349 in these cases.  (DOC. 21, 23).

**18.** Because the cases had previously been closed, and the Chapter 7 trustees discharged, Judge Rendlen reopened each case.  On December 3, 2015, he reappointed the Chapter 7 Trustees.  The Court noted that the purpose of the proceeding was to determine "whether disgorgement of the fee is proper."  (Order, December 3, 2014, Doc. 24, pp. 2-3).  The show cause orders also directed the Trustees to address, *inter alia*, to whom Robinson's fees were paid, where the fees were held following the payment to

Robinson (including whether the fees were in a client trust account), and whether any of the fees had been disbursed to Robinson or any person or attorney affiliated with Critique Services, LLC.  (DOC. 21, p. 3, DOC. 23, p.3).

**19.**   Thereafter, Robinson provided each of the Debtors with a money order fully reimbursing the debtor for all of the attorneys' fees that the debtor had previously paid him.  Although none of Petitioner's clients had sought a refund, they were willing to accept the attorneys' fees.

**20.** The refunded fees were property of the bankruptcy estate, and could only be released to the Debtors if the Chapter 7 Trustees abandoned their interest or the Court ordered the return of the fees to the debtors.

**21.** Accordingly, Petitioner contacted the Chapter 7 trustee for each of his clients to whom Robinson had tendered fees and inquired whether the Chapter 7 trustee would waive his or her interest in the fees.  Trustee Blackwell responded that he would relinquish the estate's claim to the fee, but the other trustees simply ignored the inquiry.

**22.**   Nothwithstanding the absence of any justiciable case or controversy, resulting from the refund of attorneys fees, the Chapter 7 Trustees, acting through Trustee David Sosne, continued to demand the turnover of checks, ledgers, or account statements related to the fees.  (Letter of December 3, 2014, attached as Exhibit 3 to the Trustee's Motion to Compel, DOC. 33).

23.       On December 12, 2014, the Trustees filed their Motion to Compel Turnover, requesting the Court to compel Robinson, Critique Services, LLC, and Petitioner, as Debtor's *pro bono* counsel, to provide information and documents relating to the matters addressed in the Court's Show Cause Orders.  (DOC. 33).

**24.**      The Trustee's Motion to Compel was called for hearing on January 13,

2015. At the January 13, 2015 hearing, Trustee David Sosne, the spokesperson for all of

the Chapter 7 trustees, expressed his dissatisfaction with the information that had been

provided.  As the transcript demonstrates, the Trustees were interested in "following the

money" and determining not only how Robinson handled his client trust account, but also

to determine the inner workings of Robinson's law office and staffing of that office. Thus,

Trustee Sosne wanted to know, "Who typed the debtor's bankruptcy schedules? Who

prepared the schedules? Who met – who were the people who met with the debtors? Was

it Mr. Robinson who did it all by himself and he kept the money? Or were there people

there typing at Critique Legal Services LLC, Corporation proprietorship, partnership?"

(Transcript, 1/13,15, p. 68).   Trustee Albin wanted to know, "what happened to the

attorneys fees? Did it get deposited in an operating account? Was it paid in cash?[3]

32.  Trustee Sosne asserted that these inquiries were relevant to the turnover of

unearned attorneys' fees.[4] (Transcript, 2/4/15, pp. 7-8).

---

[3] At the hearings on January 13, 2015 and February 4, 2015, the Trustees spokespersons
discussed the fact that Robinson's clients paid him in cash, apparently finding that to be
evidence of some impropriety.  (Transcript, 1/13/15, p. 65, 2/4/15, p. 6, 10, 15).
According to the Federal Deposit Insurance Corporation, a significant number of African
Americans in the St. Louis metropolitan are "unbanked," i.e., they do not have a bank
account.  It is disheartening to hear Chapter 7 bankruptcy trustees find it suspicious that
an attorney who represents primarily low-income African Americans, receives attorneys'
fees in cash, rather than by check or money order.

[4] Robinson's full refund of attorney's fees paid by his clients rendered moot the question
of whether Robinson had retained "unearned fees," which the Court could order
disgorged under 11 U.S.C. §329. *Firefighter's Local 1784 v. Stotts*, 467 U.S. 561, 571
(1984).

 It appears that the Chapter 7 Trustees may also have been intent in determining whether
Robinson and Critique Services, LLC were operating in compliance with the Settlement
Agreement and Court Order in the case of *In re: David Hardge*, Case No. 05-43244-659,

33.     At the subsequent status conference held on February, 4, 2015, Trustee

Sosne went further, saying that he wanted to know, "Who gets paid? How is it done? ….

[somebody] will have to do a subpoena and get the W2s of the people, get the tax returns,

get the financial records…. Who's reporting this income? Who's reporting these

expenses? Who's employed by whom? Who's doing what? Perhaps an inspection of the

facility to see how it's laid out, who's officing where.  They're all officing at the same

place. What's happening? It's not that complicated."  (Transcript, 2/4/15, p. 9).

34.     The Trustees cited as authority for their motion 11 U.S.C. §542(e), the

statute that provides that the bankruptcy court may order an attorney "that holds

information, including books, documents, records and papers relating to the debtor's

property or financial affairs, to turn over such *recorded* information to the trustee."

(emphasis supplied).   The statute applies only to existing records and only to records of

the debtor.  *In re: The Vaughan Company*, 2015 WL 4498746 (D. N.M. Bankruptcy

Court, July 23, 2015).  Thus, to the extent the Trustees were seeking information

regarding the operation of Robinson's law office they were far beyond the permissible

reach of the applicable statute.

---

the "Hardge Order") entered by Kathy Surratt-States, U.S. Bankruptcy Judge on July 31,
2007.  (See, Hardge Order, DOC 111-4).  The Hardge Order sets forth parameters under
which Critique Services, LLC, which had formerly operated as a bankruptcy petition
preparer, could associate with attorneys. If so, the Trustees and Judge Rendlen clearly
lacked jurisdiction to enforce compliance (and presumably to investigate compliance)
with Judge Surratt-States' Order.  In *Klett v. PIM*, 965 F.2d 587, 591 (8th Cir. 1992), the
Eighth Circuit held that a federal court cannot impose sanctions, such as contempt, for
violation of another court's order.

 And finally, Judge Rendlen has made it clear that his inquiry into the financial affairs of
Robinson and Critique Services, LLC was ***not*** motivated by a concern of a possible
violation of the state ethical rules governing the conduct of attorneys.  (Order, July 14,
2015, DOC 99, p. 3).

35.     Trustee Sosne further expressed his view that Petitioner, as Debtor's counsel, had the responsibility and obligation to obtain the information sought, including making inquiry with the co-respondents, i.e., Critique Services, LLC (at that time unrepresented and not present at the hearing), and James Robinson, who attended the hearing and represented himself.   (1/13/15, at p. 41). [5]  Sosne also expressed his view that Petitioner was a member of the "inner sanctum" of Critique, and for that reason, was in the position to obtain documents and information from Critique.  (Transcript, 1/13/15, p. 24).   At the conclusion of the January 13, 2015 hearing, the Court advised that it would issue an order in two days and require compliance with the Court's directives by noon on the following Tuesday.  (*Id*. at 84).

---

[5] Trustee Sosne stated, "[a]nd I would ask that each of them do it … in a collaborative fashion, and identify … what they know and what they don't know."  (Transcript 1/13/15 at p. 42).

> Later, the following colloquy occurred between Trustee Sosne and the Court:
>> Trustee Sosne:  What did you know and when did you know it? Who said that? But the issue is very, is very simple.  I think we're overcomplicating it.  He can make his reasonable due diligence.  He can make his inquiry, and let him provide us with those answers.  The same is true of Mr. Robinson.
>>
>> He can – he can—if he has that information, he should know that information since he was intimately involved, then he should also provide the information.  That's what we're requesting.
>
>> The Court:  And he should go and get it if he doesn't know it.  Is that what you saying?
>
>> Trustee Sosne:  Excuse me?
>
>> The Court:  He should go get it if he doesn't have it.  Is that what you saying?
>
>> Trustee Sosne:  Unless for some reason somebody stonewalls him.

(Transcript, 1/13/15, p. 48).

36.   Before the conclusion of the hearing on January 13, 2015, at the Court's insistence, Petitioner told the Court that he would make additional inquiry with Critique Services, LLC regarding any outstanding documents.  (*Id*. at 51).  The record reflects:

> Petitioner:  I will ask for documents.  I will ask for documents just as the Court has.  If I receive them, I will produce them to the trustee.  If I don't receive them, I will report to the trustee and the Court as to what response I have. … I have no special access to ledgers, client accounts.  I don't have any access to it.  If Critique wants to give it to me, I'm happy to produce it to the Court and to the trustee.  I will make the same request Your Honor has.  I will report back to as to what the nature of that response is.

(Id. at 51-2). (The Order subsequently entered by the Court advised Petitioner that he would have to make inquiry of Critique Services. Order, 1/23/15, DOC 54, p. 21).[6]

37.   Accordingly, immediately upon the conclusion of the hearing of January 13, Petitioner contacted Beverly Diltz, the owner of Critique Services, LLC, to schedule a meeting to discuss the imminent court order and the short time period for production of the outstanding documents.  Consistent with the urgency conveyed by the Court at the hearing, Petitioner met with Ms. Diltz soon after the conclusion of the hearing.  At this meeting, Petitioner encouraged Ms. Diltz, as owner of Critique Services, LLC, to produce any responsive documents that it might have in its possession.  Petitioner met with Ms. Diltz in order to comply with the instructions of Judge Rendlen.

38.   Unknown to Petitioner, Trustee Kristin Conwell, one of the Chapter 7 Trustees, entered the restaurant where Petitioner and Ms. Diltz were meeting.  Without announcing her presence, she proceeded to eavesdrop upon Petitioner's conversation with

---

[6] Judge Rendlen also stated  "[Petitioner] Briggs is not lawyer-eunuch merely because he may not currently be a formal employee or agent of Critique Legal Services, L.L.C. or Critique Services, L.L.C.   To comply with the turn over directive, Briggs can politely ask any Critique entity or Robinson for the information, he can insist firmly, he can serve a subpoena, he can file a motion asking the Court to direct a person to respond." (Order, 1/23/15, DOC. 54, p. 12).

Ms. Diltz, and surreptitiously photographed them using her cellphone. She also provided a copy of her photographs to Trustee Case.

39.     On July 6, 2015, Judge Rendlen issued an order stating that "[i]t was established that the Respondents had failed to comply with the Order Compelling Turnover," and giving notice that "the Court gives NOTICE that it is considering the imposition of monetary sanctions and/or other nonmonetary sanctions against Respondents." (Order, DOC. 91, p. 2). Notably, the Order fails to specify in which manner Petitioner failed to comply with the Order Compelling Turnover.

42.   Petitioner filed a response to the Show Cause order, asserting his rights under *Stern v. Marshall*, to a *de novo* review of any sanctions order and detailing the manner in which he had complied with the Order. (DOC. 96, p. 8).

43.   On July 16, 2015, Trustee Conwell filed her Affidavit with the Court, setting forth the fact that she had observed Petitioner and an "unknown African-American woman" (later identified by Trustee Case as Beverly Diltz), meeting and that she had overheard parts of their conversation.[7] (*In re Darrell Moore and Jocelyn Antoinette Moore*, Case No. 14-44434, DOC. 72).

44.   Simultaneously, Trustee Rebecca Case filed an affidavit, stating that based on Conwell's Affidavit, "I attended the hearing on January 13, 2015 … [n]umerous representations were made on the record during the lengthy hearing, … [v]ery shortly after the hearing, I received a photograph from Chapter 7 Trustee Kristin Conwell which

---

[7] Although much was later made of the conversation reflected in the Conwell Affidavit, the only statement that she attributes to Petitioner is his statement to Ms. Diltz that "[debtors] would have to tell the truth," to which Diltz responded, "I know that." Conwell Affidavit, Paragraph 10.

appeared to contradict the representations made at the hearing." (*In re Pauline Brady*, 14-44909, DOC. 83).

45.  On July 22, 215, the Court entered its order advising that it intended to impose sanctions upon Petitioner.  The Order gave Petitioner a choice:  1) voluntarily accept a six (6) month suspension, with additional terms, or 2) refuse to be suspended, in which case the Court, after considering any response by Petitioner, might impose additional sanctions, including a referral to the Missouri Supreme Court's Office of Chief Disciplinary Counsel.  (DOC. 109,  pp. 6-7).  Included among the terms of the "voluntary" six (6) month suspension are: 1) no bankruptcy practice, through a "back door" or "behind the scenes," 2) never again conducting "any business" with Beverly Diltz (the owner of Critique Services, LLC), with any current or former employee or independent contractor of Diltz, or any business that she owns or controls, 3) never appear at a creditors meeting on behalf of any client of any attorney associated with Diltz, and 4) never again accept any referrals from or "in any way" do business with Robinson. (DOC. 109, pp. 6-9).

46.  The basis of the Order was the Judge's apparent conclusion that Petitioner had denied knowing that Beverly Diltz was the owner of Critique Services, LLC.

47. Petitioner had never denied knowing Beverly Diltz, and he made no representations to the Court to the contrary.  Further, he never denied knowing the owner of Critique Legal Services, LLC at any hearing before the Court.

49.  The transcript of the January 13, 2015 hearing contains the following colloquy between Judge Rendlen and Petitioner:

The Court:  So who does have the information and access of Critique?

Respondent:  Probably who owns and controls it. Not me.

The Court:   Who is that to your knowledge on the record?

Respondent:  Missouri Secretary of State has a document –

The Court:   No, no, no.  Who –

Respondent:  I know –

The Court:  Who is it –

Respondent:  Mr. Robinson may well be.  It may – it may be Beverly Dilz [sic].   It

may --- but –

The Court:  What do you mean maybe?

Respondent:  That's what the Missouri Secretary of State says.  I assume it's correct.

(Transcript, 1/13/15, pp. 44-5).

50. Petitioner's statement to the Court was entirely accurate.

51.  To the extent that the Court's question regarding "Critique" was directed at

Critique Services, LLC, Petitioner accurately represented the owner as Beverly Diltz.

52.  Public filings, which were submitted to the Court on July 31, 2015,

demonstrate the accuracy of Petitioner's statement.  More specifically, the Missouri

Secretary of State reflects the incorporation of Critique Services, LLC, on August 9,

2002.  The organizer and registered agent was "Beverly Holmes."  On February 4, 2015,

Larry Mass, counsel for Critique Services, LLC, also represented to this Court that

Beverly Holmes-Diltz is the owner of Critique Services, LLC.  (Transcript, 2/4/15).  The

agreement between Critique Services, LLC and Respondent James Robinson, which was

apparently provided to Trustee Sosne on January 29, 2015, identifies Beverly Holmes

Diltz as the owner of Critique Services, LLC.[8]  And finally, the Settlement Agreement and Consent Order filed with Judge Kathy Surratt-States in *In re: David Hardge*, Case No. 05-43244, further identifies Beverly Holmes Diltz as the "sole member" of Critique Services, LLC. (The Secretary of State records and Hardge Settlement were submitted to the Court on July 31, 2015, in response to Judge Rendlen's July 22 Order advising his intent to impose sanctions, DOC. 114-2, 114-4, 111-6).

53.  To the extent that the Court's question pertained to the attorney doing business as "Critique Services," Petitioner accurately identified the owner as James Robinson.  In contrast, Respondent Robinson registered the fictitious name of "Critique Services" on May 10, 2005, and filed each of the petitions before the Court as "James C. Robinson, d/b/a Critique Services."

54.  To the extent that the Judge Rendlen's conclusion that Petitioner made misrepresentations before the Court is based on conclusions that the Court drew from Petitioner's meeting with Ms. Diltz, in a public place, immediately following the hearing, Petitioner was acting in accordance with the Judge Rendlen's directives.

55.  On August 4, 2015, the Court entered an order once again rejecting Petitioner's position that he had a right to a *de novo* hearing under *Stern*, and indicating that he intended to enter a final order.  In this Order, Judge Rendlen insinuated that

---

[8] The relationship between Critique Services, LLC and Respondent James Robinson d/b/a Critique Services as it relates to these Chapter 7 debtors is set forth in greater detail in Robinson' Agreement with Critique Services, DOC 111-5, pp. 7-10). Most important, however, the document reveals that Respondent Briggs was not a party to the agreement and had no formal relationship with either Critique Services, LLC or Attorney James Robinson in regard to these cases.

sanctions may be imposed upon Petitioner for failing to disclose the lunch meeting with Diltz. (DOC. 112).

56.   On January 24, 2015, Petitioner disclosed to Judge Rendlen that Petitioner was engaged in direct communications with Robinson and Critique Services, LLC in an effort to secure the production of requested documents. (DOC. 57).  Nothing in the record, in the transcript of proceedings or in any prior order the Court, informed Petitioner that the method of communication with co-respondents (i.e. correspondence versus personal conversation) or that the location of the communication (i.e., a restaurant), was material to the Court and required "disclosure."

57.   Trustees Conwell and Case likewise appeared to believe that the details of the January 13 lunch meeting were not germane to any outstanding request of Judge Rendlen. At the February 4, 2015 status conference, which Trustee Conwell attended, she did not disclose to the Court or to Petitioner the fact of the January 13 lunch meeting or her surreptitiously-taken photographs.  On March 26, 2015, Judge Rendlen directed the Trustees to file with the Court any documents produced by Petitioner in compliance with the Order of the Court.  (DOC.  75).  Again, Trustees Case and Conwell responses do not mention the January 13 lunch meeting.  It was not until Judge Rendlen's July 6, 2015 Show Cause Order (entered over three months later), that the Court directed the Trustees to disclose whether "she or he has become aware of any additional facts that bear on the issue of compliance with the Order Compelling Discovery, _or the representations made at the January 13 or February 4 hearings_." (DOC. 91, p. 4)(emphasis supplied). Only at

this point did Trustees Conwell and Case reveal the information regarding the lunch meeting that had been withheld from the Court and the Petitioner for nearly six months.[9]

## The Reasons Why the Writ Should Issue

### Summary

The Bankruptcy Court is acting outside of its Article III jurisdiction by purporting to impose a final Order for sanctions upon Petitioner.  The Court's jurisdiction is limited to 1) making proposed recommendations and conclusions of law for *de novo* review by this Court, or 2) initiating a disciplinary procedure against Petitioner by referring the matter to this Court for proceedings under Local Rule 83.  The suspension of Petitioner from the Bankruptcy Court is an immediate and irreparable harm to Petitioner (and Petitioner's clients), for which there is no other adequate remedy.

## I

### The Bankruptcy Court has Acted Outside of its Constitutional Authority

The Bankruptcy Judge lacks jurisdiction to enter a final judgment imposing sanctions upon Petitioner.  Bankruptcy Judges are Article I judges, not Article III judges. *Wellness International Network, Ltc., v. Sharif*, ____ U.S. ___, Slip Opinion, p. 1 (May 26, 2015).  Any exercise of judicial power by the Bankruptcy Court must be within the confines of Article III.   For over four decades the United States Supreme Court has

---

[9] Even today, Trustee Conwell has failed to provide to Petitioner and the Court her notes of the January 13, 2015 lunch meeting, or account for their absence.  Conwell states that she "took notes" on January 13, 2015.  If she still has the notes in her possession, it is troubling that they were not produced along with the Affidavit.  Conwell signed the Affidavit, under oath, on July 15, 2015, over six (6) months after the lunch meeting.  If she no longer has the notes, their absence certainly casts doubt on the accuracy of the statements contained in the Affidavit.

clearly and consistently identified the constitutional limitations on the Article I Bankruptcy Court.

In the Bankruptcy Court Act of 1978, Congress created the bankruptcy courts as adjuncts of the district courts.  The 1978 Act created a broad scheme of bankruptcy jurisdiction that empowered bankruptcy courts to hear and determine civil cases that had any kind of relationship to a bankruptcy case, including state law contract actions by debtors against parties not otherwise a part of those proceedings.  In 1982, in *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed. 598 (1982), the Supreme Court struck down this broad jurisdictional grant as an unconstitutional delegation of the Article III powers.  A plurality of the Supreme Court concluded that such claims could not be assigned to bankruptcy judges without violating Article III, because those judges lack tenure and salary guaranties.  The Supreme Court concluded that state law contract actions were not matters of "public rights" that can be constitutionally be assigned to "legislative" courts.  Nor were bankruptcy judges who exercised such broad jurisdiction "adjuncts" of the district courts.

Congress acted in 1984 by enacting amendments that changed how the bankruptcy judges were appointed and limited their ability to enter final judgments by confining their jurisdiction to "core" proceedings that are enumerated in 28 U.S.C. §157(b)(2).  Bankruptcy Courts may hear and determine non-core proceedings, but only upon the parties' consent.  If the parties do not consent, the Bankruptcy Court must submit findings of fact and conclusions of law to the district court for *de novo* review.  28 U.S.C. §157(c)(1).  In conducting  *de novo* review, the district court may receive further evidence, modify the proposed findings by the bankruptcy court, and/or remand to the

district court with instructions.  Fed. R. Bankr. P. 9033(d).   In addition, the Bankruptcy

Code gives Bankruptcy Judges the power to hear any claim arising under Title 11.  28

U.S.C. §157(b)(1).

The Supreme Court has articulated the limited jurisdiction of the Bankruptcy

Courts – even where claims that are expressly within the Bankruptcy Court's jurisdiction

under the Bankruptcy Code are the subject of review.

Thus, in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106

L.Ed. 2d 26 (1989), the Court held that a bankruptcy trustee's action to recover a

fraudulent transfer – a claim specifically commended to bankruptcy court jurisdiction by

Title 11 – was a private right of action which could only be determined by an Article III

judge.  The Court reasoned that the 11 U.S.C. §548(a)(2) fraudulent conveyance suits

brought by the bankruptcy trustees "more nearly resemble state-law contract claims

brought by a bankrupt corporation to augment the bankruptcy estate than they do

creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res.  As a

consequence [the Court] concluded that 'fraudulent conveyance actions were 'more

accurately characterized as a private right rather than as public right as [the Court] has

used these terms in [its] Article III decisions. " 492 U.S. at 55-56, 6U.S. at 56, 109 S.Ct.

at 2782.  "Because the [defendants] have not filed claims against the estate, [the trustee's]

fraudulent transfer action does not arise 'as part of the process of allowance or

disallowance of claims.'"   The Court went on to state:

> [T]he restructuring of debtor-creditor relations, which is at the core of
> federal bankruptcy power, must be distinguished from the adjudication of
> state-created private rights, such as the right to recover contract damages.
> ... The former may well be a 'public right,' but the latter obviously is not."
> *Northern Pipeline Const. Co. v. Marathon Pipe Line Co*., 458 U.S. 50, 71,
> 102 S. Ct. 2858 (1982). In the bankruptcy context, a cause of action is a

purely private right if it does not implicate, in any way, the claims allowance process or the restructuring of debtor creditor relations.

*Granfinanciera*, 492 U.S. at 56; *In re Palm Beach Finance Partners, L.P.*, 501 B.R. 792, 798 (Bktcy. S.D.Fla. 2013).[10]

More recently, the Supreme Court again reiterated the Article III limitations on the jurisdiction of the bankruptcy courts. In *Stern v. Marshall*, 564 U.S. __, 131 S. Ct. 2594 (2011), Vickie Marshall, a debtor in a bankruptcy proceeding, filed a counterclaim against her son-in-law for defamation. The Bankruptcy Code list of "core" proceedings specifically includes counterclaims by the estate against entities filing claims against the estate. (Ms. Marshall's son-in-law had filed a tort claim against Ms. Marshall in the bankruptcy proceeding.) The bankruptcy court conducted a trial and awarded Ms. Marshall $400 million in damages. After Ms. Marshall's death, her Executor, Howard Stern, was substituted as a party. The Supreme Court held that although Stern's counterclaim was expressly a core proceeding under the Bankruptcy Code, that section unconstitutionally delegated the power to hear a state law counterclaim, a "private" right, to a "legislative court." Because the bankruptcy court decided issues in Ms. Marshall's defamation claim that were not intrinsic to allowing or disallowing the defendant's

_____

[10] That the Bankruptcy Court only has jurisdiction in light of Article III to enter proposed findings of fact and conclusions of law, subject to *de novo* review, is consistent with the historical development of bankruptcy court jurisdiction. *A Survey of Sanctions in Bankruptcy Courts: The Fifth Circuit and Beyond*, 55 S.Tex. L. Rev. 583, 599-601 (2014). Since 1898, the Bankruptcy Act allowed non-judicial referees to marshal a debtor's assets, liquidate, and distribute the proceeds among those filing valid claims against the estate. *Id*. Jurisdiction over the res, i.e., the estate, supported the referee's rights to invalidate a claim, enforce a security interest, or determine the ranking of competing claims. Plan confirmation, discharge, liquidation of estate assets, distribution and ranking of claims against estate assets, voting, and classification of claims are well within this traditional exercise of power. *Id*.

bankruptcy claim, it had exercised the Article III judicial power (a power that the bankruptcy court did not possess), in deciding the claim. Consequently, the judgment was reversed.

Justice Roberts, writing for the majority, explained the constitutional significance of the distinction between the Article III courts and the Article I courts:

Article III imposes some basic limitations that the other branches may not transgress. Those limitations serve two related purposes.  "Separation of powers principles are intended, in part, to protect each branch of government from incursion from the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern.  The structural principles secured by the separation of powers protect the individual as well." *Stern*, *supra*.

The restrictions of Article III on bankruptcy judges are similar to its restrictions on Article I magistrate judges.  Federal magistrates are Article I judges – they derive their authority to exercise judicial functions through the Congressional grant of authority, not through Article III.  *U.S. v. Torres*, 258 F.3d 791, 794 (8th Cir. 2001).   Absent the consent of the parties, a magistrate cannot enter a final ruling on any dispositive motion. A sanctions motion, particularly one imposed on a third party for discovery violations, is a dispositive motion. *Wallace v. Kmart*, 687 F.3d 86 (3rd Cir. 2012); *Alpern v. Lieb*, 38 F.3d 933, 936 (7th Cir. 1994); *Bennett v. General Custer Service of N. Gordon Co.*, 976 F.2d 995, 996 (6th Cir. 1992); *Kiobel v. Millson*, 592 F.3d 78 (2d Cir. 2010((J. Cabranes, concurring).  In such an instance, the magistrate has only the authority to enter proposed findings and recommendation, subject to *de novo* review by the District Court.  Likewise, the Bankruptcy Court can not enter a final order imposing sanctions; rather, the

Bankruptcy Court can only submit proposed findings of fact and conclusions of law to this Court for *de novo* review.  *Executive Benefits Insurance Agency v. Arkison*, __ U.S. __, 134 S. Ct. 2165, 2172-3 (June 9, 2014).

        *In re Sheridan*, 362 F. 3d 96 (1st Cir. 2004), a case decided prior to *Stern*, is instructive.  In *Sheridan*, the bankruptcy court appointed a special master to investigate attorney Sheridan's conduct in closed bankruptcy files.  Ultimately, the special master determined that Sheridan had violated the duty of competent representation during his representation of a number of clients, and entered an order suspending Sheridan from the bankruptcy bar.   The First Circuit held that the omnibus disciplinary proceedings were non-core, and that, as such, the bankruptcy court could not enter a final order.  In reaching its decision, the Court noted that the proceedings did not purport to adjust "debtor-creditor relations," but "consisted largely of the bankruptcy court's exercise of its supervisory authority to oversee and regulate its bar and to safeguard the public confidence in the integrity and functionality of the bankruptcy court."  *Id*. at 107-8. Further, the Court held that the rights at issue arose from the state law rules of professional responsibility, and as such were non-core.   *Id*. at 108-9.  Finally, as a policy matter, the Court held that where the attorney misconduct occurred outside of the court room, the Bankruptcy Judge would have no greater expertise than the district court. *Id*. at 109-10.

        *Sheridan* is instructive because it demonstrates that Judge Rendlen lacks the jurisdiction to enter a final sanction order in the underlying proceeding against Robinson. In each instance, Judge Rendlen re-opened a closed bankruptcy case and re-appointed the Chapter 7 trustees and directed them to provide information relating to Robinson's trust

account and other financial matters.    In the first instance, the Court proceeded under 11

U.S.C. Section 329, the statute which permits the Court to order the return of unearned

fees to the bankruptcy estate.  This action is analogous to a state law claim by a client

against an attorney for breach of contract.  Even though the claim is specifically

enumerated in the Bankruptcy Code, it is a non-core matter. *Granfinancieria*, *supra*. [11]

Moreover, even if Judge Rendlen had "core" jurisdiction over a claim for the

refund of the attorneys fees, the full reimbursement of the attorneys' fees rendered the

proceedings moot. Once the fees were returned to the debtors and the exemptions

allowed, no order of the Bankruptcy Court could further effect debtor-creditor relations.

Moreover, the Show Cause Orders and the Trustees' discussions before the Court amply

demonstrate the proceedings were being used to investigate the operation of Robinson's

law office and his compliance with the Missouri Rules of Professional Responsibility.

These are state law matters which are outside the "core" jurisdiction of the bankruptcy

court. *Sheridan*, *supra*.

Further, if the putative claim for an attorney fee refund from Robinson is non-core

and implicates the full protection of Article III, then ancillary orders arising from such

proceeding – such as an order on a motion to compel – must likewise be "non-core" and

encompassed within the protection of Article III.  The same conclusion applies if the

collateral issue of "sanctions" arises from the alleged non-compliance with an underlying

order.  "[A] motion for sanctions, though it is in the context of an underlying action, is

the functional equivalent of an independent claim."  *Kiobel v. Millson*, *supra*, 592 F. 3d at

---

[11] In *Granfinancieria*, the Supreme Court held that a trustee's claim for fraudulent
conveyance, a claim specifically found in the Bankruptcy Code, 11 U.S.C.§458(a)(2),
was analogous to a state law claim and thus within the Article III jurisdiction.

86.   In *Alpern v. Lieb*, 38 F.3d 933, 935 (7th Cir. 1994), the Seventh Circuit, using similar reasoning, commented on the limited sanction power of an Article I judge:  "The power to award sanctions, like the power to award damages, belongs in the hands of the district court judge.  …. A district judge may refer a dispute about sanctions to a magistrate judge for a recommendation … but the magistrate judge may not make a decision with independent effect."  *Accord*, *Bennett v. General Custer Service*, 976 F.3d 995 (6th Cir. 1992).

Thus, just as Judge Rendlen lacks jurisdiction to enter a final order against Robinson, he lacks jurisdiction to enter the sanction of suspension upon Petitioner where such order does not implicate the administration of a creditor claim or the re-ordering of debtor-creditor relations.  *Accord, Klett v. PIM*, 965 F.2d 587, 591 (8th Cir. 1992).[12]

Judge Rendlen's proposed *sua sponte* sanctions order imposing a six-month suspension involves neither the adjustment of debtor-creditor relations nor the claims allowance process.  Consequently under the holdings of *Stern* and *Granfinancieria*, Judge Rendlen's proposed action is a usurpation of the Article III judicial power.  While Judge Rendlen could enter proposed findings of fact and recommendations to the District Court, regarding sanctions or a matters involving contempt, such a judgment can only be entered by the District Court after a *de novo* review.  *Accord*, *In re Ragar,* 3 F3d 117 (8th Cir. 1993)(*dicta*).

Judge Rendlen ruled that Petitioner had no right to a *de novo* review under *Stern* because, "[t]he issue of whether to award sanctions for the refusal to comply with a

---

[12] In *Klett*, the Eighth Circuit held that where a court lacked subject matter jurisdiction of the underlying claim, it lacked jurisdiction to enter sanctions for a violation of that claim. Similarly, because the claim before Judge Rendlen is "non-core" any sanctions relating to that claim are also "non-core."

bankruptcy court order…is a matter that arises under Title 11 and the inherent power of the Court to enforce its own orders."  (Order, August 4, 2015, DOC. 112, p. 18).  The Judge is incorrect.   Even though 11 U.S.C. §329 is found in Title 11, *Granfinancieria* makes it clear that cases that are explicitly permitted under Title 11 may still encroach upon the Article III jurisdiction.[13]  Under the rationale of *Granfinancieria*, an action for the return of attorney's fees is analogous to a state court contract action, and is precisely the type of action which is reserved for an Article III court.

Further, inasmuch as Robinson has returned all of the attorneys' fees, there is simply no basis for any further action by the Court under 11 U.S.C. §329.  As the transcript makes clear, the Trustees are simply using the proceeding as an unbridled opportunity to investigate Robinson's law practice, including the handling of his trust account, the staffing of his office, and the payment of his employee's wages.  These are outside of the scope of the jurisdiction of the Bankruptcy Court.

The Court is also incorrect that it can impose sanctions under its inherent power. Any inherent judicial power that the Court exercises is derivative from the Article III judicial power and must be exercised consistently with that power.  *Hipp v. Griffith*, 895 F.2d 1503 (5th Cir. 1990).  In *Hipp*, the United States Court of Appeals for the Fifth Circuit addressed the issue of whether a bankruptcy court could rely upon its "inherent" powers to issue a criminal contempt.  Noting the "oft repeated phrase" that "the contempt power is inherent in all federal courts," 895 F.2d at 1512, the Court held that the bankruptcy court has no inherent power to enter a criminal contempt, because the

---

[13] In Granfinancieria, the Supreme Court held that a trustee's claim for a fraudulent conveyance – a claim that is explicitly permitted by 11 U.S.C.§458(a)(2) - could only be decided by an Article III court.

Bankruptcy Court is not an Article III court.  *Id.*  The Court held that the bankruptcy

court, like the magistrate court, must look to the district court for the enforcement of its

orders.[14]  Here, the sanctions order is imposed to punish Petitioner or to force Petitioner

to comply with the Court's order compelling turnover. In either case, the sanction is being

used to enforce compliance with the Bankruptcy Court's order.  Just as the Bankruptcy

Court has no inherent power to enforce its orders via criminal contempt, it has no

inherent power to enforce its orders via sanctions.

Finally, even if Judge Rendlen has the inherent power to suspend Petitioner, he

cannot do so on this record.  The sanction of suspension is quasi-criminal contempt.

Assuming Judge Rendlen had such a power, he can only exercise it in this summary

fashion, without a hearing, to punish a contempt that occurred in the presence of the

Court.  *In re Dowdy*, 960 F.2d 78 (8th Cir. 1992).  Such "direct" contempt is committed in

the eye and presence of the Judge, and does not rely on the testimony of third parties or

the alleged contemnor.  *In re: Heathcock*, 696 F.3d 1362, 1365 (11th Cir. 1992). Judge

Rendlen bases his proposed sanction on the hearsay affidavits of Trustees Conwell and

Case regarding matters that occurred outside of the court-room.  Thus, any inherent

contempt power will not support the proposed sanction judgment.

---

[14] "'[T]he contempt power, like all powers of the federal courts, cannot be inherited from
thin air, but must flow from the Constitution.'"  *Hipp*, *supra*, 895 F.2d at 512. (citations
omitted).  "In short, today's bankruptcy courts are arguably at least as much like
magistrates or administrative agencies as they are like other non-Article III courts.
Magistrates, who with the consent of the parties may conduct jury trials and criminal
misdemeanors may only certify facts showing contempt to the district courts.  Similarly,
administrative agencies may order persons to act or refrain from acting, but they must
usually look to Article III courts to enforce those orders if they are disobeyed."  *Id.*

## II.

### The Bankruptcy Court Lacks Jurisdiction to Suspend Petitioner; Only the District Court Can Suspend Petitioner Pursuant to the Rules of Disciplinary Enforcement

Local Rule 83 of the United States District Court provides a procedure for the disciplining of attorneys who are admitted to the United States District Court for the Eastern District of Missouri.  The Local Rules of the Bankruptcy Court contain no procedure for disciplining attorneys.  There can be no dispute that the regulation of attorneys is a judicial function, and as such, can only be exercised by an Article III judge. The district court has original jurisdiction of all cases arising under the Bankruptcy Code. The District Court, not the Bankruptcy Court, controls the admission of attorneys to the Bankruptcy Bar. Just as a Magistrate Judge in the Eastern District of Missouri lacks the authority to suspend an attorney, *sua sponte*, the Bankruptcy Court lacks that authority as well.

Judge Rendlen has acted as accuser, fact-finder and sentencing judge, all without the benefit of an evidentiary hearing of any kind.   If the Rules of Disciplinary Enforcement of this Court had been followed, a special counsel would have been appointed to investigate and determine whether a formal disciplinary proceeding is appropriate.  (Rules of Disciplinary Enforcement, Article V.B.). Where, as here, the accusing party is a judge, that judge cannot serve on the disciplinary panel. (*Id*.  Article V.D.)  The Rules of Disciplinary Enforcement protect Petitioner's due process rights and provide sufficient protections for the drastic remedy of attorney suspension.  The lack of any due process in the bankruptcy court action violates Petitioner's Fifth Amendment Due Process Right.

28

III.

**Petitioner has No Adequate Remedy**

Petitioner has no adequate remedy at law.  Petitioner anticipates that his

suspension will be immediate.[15]  The history of Mr. Robinson's suspension demonstrates

that an appeal will not adequately protect Petitioner's interests.   Robinson appealed his

suspension to this Court and to the Eighth Circuit, where it is pending.  Both Judge

Rendlen and Judge Sippel denied Robinson's request for a stay. The one-year period of

suspension expired on June 11, 2015.  Thereafter, Judge Rendlen entered an order

continuing the suspensions because, *inter alia*, a) the Missouri Supreme Court's Office of

Chief Disciplinary Counsel had not completed its investigation of the referrals (based on

their conduct before Rendlen), and b) this Court had entered "formal disciplinary

proceedings" against Robinson and Walton.  (*In re: LaToya Steward*, Case No. 11-46399,

DOC 300, Order, 6/15/15, p. 6).  Consequently, under Rendlen's Order, Robinson will

remain suspended before the Bankruptcy Court until the completion of his appeal to the

Eighth Circuit and the completion of the OCDC referral, a period far in excess of the

original one-year period.

Petitioner's clients will also suffer immediate and irreparable harm in the absence

of the writ.  Most are low-income minority debtors without the financial means to obtain

substitute counsel, who will no longer have representation in their bankruptcy

proceedings.  Their interests can be considered in determining the harm that will occur if

this Writ is not granted. *Camacho v. Brandon*, 317 F.3d 153, 159 (2d. Cir. 2003).  A

little over a year ago, hundreds of African-American debtors were cast adrift to fend for

---

[15] Upon his suspension, the Local Rules of the Bankruptcy Court prohibit Petitioner from
receiving fees on his pending Chapter 13 cases, absent a court order.

themselves as a result of the suspension Mr. Robinson.  Judge Rendlen's impending

sanctions order will repeat this for hundreds of African American debtors.

Petitioner was duty bound by his oath as an attorney to take the steps within his

ability to respond to the plight of the unrepresented.  Petitioner respectfully submits that

this Court is likewise bound to ensure that the United States Constitution, and the

protections of Article III, are observed and enforced within the United States Bankruptcy

Court for the Eastern District of Missouri.  Accordingly, this Writ of Prohibition should

issue.

<u>Relief Requested</u>

Petitioner requests an Order from this Court prohibiting Judge Rendlen from

entering any final judgment suspending Petitioner from practice before the Bankruptcy

Court or imposing any similar sanction upon Petitioner, and directing him that if he

believes such sanction is warranted, his action should be in the form of a

recommendation to this Court.

> Respectfully submitted,
> */s/ Ross H. Briggs*
> Ross H. Briggs, #2709EDMo, #31633
> 4144 Lindell Boulevard, Ste. 202
> St. Louis, MO  63108
> (314) 652-8922
> r-briggs@sbcglobal.net


Certificate of Service

By my signature, I certify that on August 6, 2015, I served the foregoing
document, by hand-delivery upon:

Honorable Charles E. Rendlen III
United States Bankruptcy Court
c/o Dana C. McWay, Clerk, United States Bankruptcy Court
Thomas F. Eagleton U. S. Courthouse

111 South 10th Street, 4th Floor
St. Louis, MO  63102

And by electronic mail and First Class, United States Mail, postage pre-paid to:

Robert J. Blackwell
Blackwell and Associates
P.O. Box 310
O'Fallon, MO 63366-0310
rblackwell@blackwell-lawfirm.com
bvoss@blackwell-lawfirm.com

*/s/Ross H. Briggs*